**SUSAN MARTIN (AZ#014226)**
**JENNIFER KROLL (AZ#019859)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
jkroll@martinbonnett.com

Attorneys for Plaintiff and the Classes

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Wayne Bryant, on his own behalf and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br>v.<br><br>Pension Plan for the Arizona Pipe Trades Pension Trust Fund; Board of Trustees of the Arizona Pipe Trades Pension Trust, Plan Administrator of the Pension Plan for the Arizona Pipe Trades Pension Plan; Arizona Pipe Trades Defined Contribution Plan; Board of Trustees of the Arizona Pipe Trades Defined Contribution Plan, Plan Administrator of the Arizona Pipe Trades Defined Contribution Plan,<br><br>　　　　　Defendants. | Case No.:  2:13-cv-01563-GMS<br><br>**MOTION FOR FINAL APPROVAL OF SETTLEMENT AGREEMENT**<br><br>**(Fairness Hearing to be held November 19, 2015 at 2:00 p.m.)** |

Pursuant to Fed. R. Civ. P. 23, the Order of this Court preliminarily approving the Parties' Settlement Agreement, (Doc. 103), Named Plaintiff and Class Counsel respectfully request that the Court grant final approval of the Parties' Settlement Agreement.[1] This motion is supported by the attached Declarations of Plaintiff's Expert, Julia Allen Miessner ("Miessner Decl."), Susan Martin and exhibits thereto ("Martin Decl."), Wayne Bryant ("Bryant Decl.") and the record before this Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

The Settlement Agreement provides an excellent result for the 859 Class Members by providing substantial monetary relief as well as prospective relief governing the Plans' procedures for notice, allocation, transfer and crediting of reciprocal contributions between the DB and DC Plans. It removes the risk of non-recovery for all Class Members who were damaged and whose individual DC Plan accounts were short-changed as a result of the changes in the methodology for allocating reciprocal contributions between the DB and DC Plans. The Settlement Agreement guarantees relief for participants whose Reciprocal Contributions were not properly credited to their DC Plan accounts for the 2009 Plan Year after the adoption of a Mid-Year Valuation Date of November 30, 2008. The Settlement Agreement, Section III(F), also protects DC Plan participants who were better off under the DC Plan or who received higher DB Plan benefits under the challenged amendments by providing that no diminution in any participant's DC account or DB Plan benefits can occur.

Plaintiff's counsel and expert spent hundreds of hours during this litigation analyzing Defendants' records, calculating damages and assisting in developing the Plan of Allocation. Miessner Decl. ¶¶4-5, 6-8, 10-16, 17-20; Martin Decl. ¶¶13, 15. To determine the potential value of Class 1 Members' damages, Plaintiff's expert calculated and compared the amount that would have been credited to each class member's DC Plan account under the original Memorandum of Understanding with the amount that was actually credited under the Revised Memorandum of Understanding ("Amendment 1 Methodology") and then added interest. Miessner Decl. ¶¶6-7,17-19; Martin Decl. ¶¶6. As

---

[1] The capitalized terms have the meaning set forth in the Parties' Agreement. Doc. 101-1.

explained in the Miessner Decl. ¶¶6-7,17-19, in accordance with Plaintiff's counsel's position on the remedy of disgorgement, in computing interest on the amounts due to Class 1 Members, only positive earnings for the DB Plan were included and no downward adjustments for years in which the DB Plan had negative earnings were made.

Plaintiff's expert calculated damages for Class 2 Members (as such class is currently defined) by determining the amount that Class 2 Members lost as a result of the failure to properly credit DC Plan reciprocal contributions for the 2009 Plan year following the adoption of a Mid-Year Valuation Date of November 30, 2008 and then adding as interest the amount the DC Plan actually earned on and after 2009 in order to replicate the amount that participants would have actually had in their accounts if the terms of the Plan had been properly administered ("Mid-Year Valuation Methodology"). Miessner Decl. ¶¶8, 17-19.

The total recovery under the Settlement for Class 1 and Class 2 Members utilizing these methodologies are approximately 89% of the calculated losses. *Id.* ¶19. If Class Counsel's application for attorneys' fees is granted and Plaintiff's application for a case contribution award is approved, each Class Member will receive a net payment of approximately 66.6% of their losses computed in this manner. *Id.* During the litigation Defendants argued that negative earnings of the DB plan should be included in the calculation of damages and that it was improper to disregard the years in which the DB Plan lost money on investments. *Id.* ¶¶14-16, 20. The Settlement Agreement makes no finding in this regard. Nevertheless, in evaluating the fairness and adequacy of the settlement, it is important to note that even if Plaintiff had been successful in establishing liability, the calculation of losses to each class member was hotly disputed. *Id*. Rather than the total losses as calculated by Plaintiff's expert of $6,492,744, Defendants argued that losses should be reduced for a variety of reasons. *Id.* ¶¶14-16, 19. Applying the negative earnings of the DB Plan would have produced a total damage figure of $5,517,582. *Id.* ¶¶20. Under that methodology, the $5.8 million Settlement Fund would represent over 105% of total losses with interest and the net amount to be paid to class members, if the

fee application and case contribution award are granted, would be approximately 78.4% of total Class Member losses. *Id.* In addition, Defendants argued for additional reductions in the amount of damages that took into account and offset the value of additional benefits earned in the DB Plan, as well as the value of higher benefits received by 51 of the 859 Class Members who had no damages. *Id.* ¶¶ 15-16. None of these offsets or reductions are permitted under the Settlement Agreement. Section III(F).

Given the risks of these arguments and other defenses asserted by the Defendants including time-based defenses, and the time value of a resolution now, the Settlement Agreement provides an excellent result and provides excellent relief for the Class Members.

**BACKGROUND**

The facts and history of the litigation are described in the Parties' Joint Motion for Preliminary Approval, Doc. 101, at pp. 1-5. By way of brief summary, Plaintiff Wayne Bryant, a journeyman steamfitter welder, began participating in the DB Plan and in the DC Plan in or around 1982. Mr. Bryant's home Local Union was in Tucson, Arizona. At various times, Mr. Bryant traveled outside of the jurisdiction of the Local Union to work in other states to support his family. Bryant Decl. ¶ 4.

Defendants participated in the International Union's national reciprocity program effective June 1, 2002. In many jurisdictions including those where Mr. Bryant worked on and after June 1, 2002, the rates contributed by out of state employers and transferred to the Plans under the national reciprocity program exceeded those required to be contributed by Arizona employers under Arizona collective bargaining agreements. The Amended Complaint asserts that Defendants adopted Memoranda of Understanding in early 2004, retroactive to June 1, 2002, that provided a methodology for calculating and crediting the Reciprocal Contributions received by the Plans. The Memoranda of Understanding provided that Reciprocal Contributions received by the DB Plan for hours worked out of state by Plan participants that exceeded the required Arizona hourly contribution rates ("Excess Contributions") would be transferred to Class Members' individual accounts in the DC Plan.  The Amended Complaint further alleges that on or about June 24, 2004, the

Defendants adopted Revised Memoranda of Understanding that improperly amended the methodology for crediting and allocating such Reciprocal Contributions retroactively to June 1, 2002. Under the Revised Memoranda of Understanding, all Reciprocal Contributions were kept by the DB Plan and no Excess Contributions were paid to the DC Plan unless a participant earned a full year of credit under the DB Plan (using the amount of contributions required to earn a full year of credit at the Arizona rate).[2]  After a full year of credit was earned in the DB Plan, the Reciprocal Contributions were split between the DB Plan and the DC Plan in proportion to the relative Arizona contribution rate relative to the combined rates of both Plans.

With respect to Class 1, the Amended Complaint asserts that Defendants' adoption, implementation and ongoing administration of the Revised Memorandum of Understanding  violates ERISA §204(g) and (h) (Count I), the terms of the Plan (Count II) and breaches Defendants' fiduciary duties and constitutes ERISA prohibited transactions (Count III).[3] Plaintiff alleged that the revised methodology resulted in improper delays of transfers of Reciprocal Contributions from the DB Plan to the DC Plan in that Defendants would wait until long after the close of the Plan year to transfer Reciprocal Contributions.

Plaintiff elected to begin distribution of his DC Plan benefits in or around August 2007 while he was still working. Bryant Decl. ¶5. While he received his distributions,

---

[2]  A full year of credit in the DB Plan as of June 1, 2002 was 1,400 hours.  Effective June 1, 2006, participants were required to have 1,600 hours in order to earn a full year of credit.  Until 2014, a participant could only receive one credit in the DB Plan no matter how many contributions were received. During the pendency of this litigation, Defendants amended the DB Plan so that from June 1, 2014 to June 1, 2017, participants now earn up to 1.5 DB Plan credits each Plan year by accruing tenths of a credit for hours  up to 2400.

[3] Class 1 was previously denominated Subclass 1. Class 1 originally included all DC Plan participants but that definition was modified and Subclass 1 was denominated Class 1. Doc. 103, at 1-2.  Class 1 as originally denominated alleged harm from delayed transfers of contributions from the DB Plan to the DC Plan. As set forth in the Miessner Decl. ¶9, following extensive review of records, it was determined that while the DB Plan arguably failed to timely transfer Reciprocal Contributions to the DC Plan, when the funds that were being held by the DB Plan were transferred to the DC Plan, some earnings were eventually included. Although the parties disagreed on the amount of interest that should have been transferred, there was no dispute that transfers of Reciprocal Contributions from the DB Plan to the DC Plan with earnings were made.  *Id.*

Plaintiff continued to work and Reciprocal Contributions were received on his behalf. *Id.* During this time, during the 2009 Plan Year, the DC Plan was amended retroactively to adopt a Mid-Year Valuation Date of November 30, 2008 instead of a single end-of- year valuation date. Plaintiff alleges that Defendants incorrectly calculated individual participants' account balances with respect to participants who received reciprocal contributions between June 1, 2008 and November 30, 2008 for the 2009 Plan year. As a result, Plaintiff alleges that participants for whom Reciprocal Contributions were paid to Defendants for the 2009 Plan Year between June 1, 2008 and November 30, 2008 did not receive positive earnings realized on May 30, 2009 on the Reciprocal Contributions for the 2009 Plan year that should have been credited to their DC Plan accounts on December 1, 2008. With respect to Class 2, the Amended Complaint asserts that in implementing the November 30, 2008 Mid-Year Valuation of the DC Plan, Defendants violated Plan provisions governing the calculation and crediting of participant accounts for participants who received Reciprocal Contributions between June 1, 2008 and November 30, 2008 (Count II) and breached their fiduciary duties (Count III).

In or around April 2011, Defendants advised Mr. Bryant that he had been purportedly overpaid his DC Plan benefits. *Id.* ¶6. Believing that Defendants were incorrect and having received very little information regarding the crediting of his Reciprocal Contributions or changes to the methods for crediting such Reciprocal Contributions, Mr. Bryant attempted to find out more. *Id.* Mr. Bryant spent the next year attempting to obtain additional information about the crediting of his Reciprocal Contributions. *Id.* The information was difficult to come by and Defendants kept changing the amount of Mr. Bryant's purported overpayment. *Id.* When Plaintiff brought this lawsuit, Defendants asserted that Mr. Bryant's claims were not timely. Doc. 26 p. 10 ¶2. Mr. Bryant attempted to exhaust remedies by asking several times to have the Board of Trustees decide his claims, Bryant Decl. ¶6, only to have Defendants assert in this lawsuit that he did not exhaust administrative remedies. Doc. 26 p. 10 ¶3. Defendants threatened to charge Mr. Bryant interest on amounts they asserted were overpaid even though

Plaintiff believed that the DC Plan owed him contributions. Bryant Decl. ¶6. Plaintiff finally found an attorney to take his case, which was not an easy endeavor in an ERISA case where a pension plan was asserting that it was going to take action against a participant. Bryant Decl. ¶7; Martin Decl. ¶10. Following review by counsel, counsel's request for additional information and documents from Defendants and attempts to settle the matter without litigation, Plaintiff brought this action. Bryant Decl. ¶8.[4]

## PROCEDURAL HISTORY

Plaintiff filed the Complaint on July 31, 2013. Doc. 1. Defendants filed a Motion to Strike, or In the Alternative, Motion to Dismiss on September 30, 2013 raising matters that had never been raised in the required meet and confer process. Doc. 12. While simultaneously preparing an opposition to Defendants' motion to dismiss, Plaintiff made a motion to strike Defendants' motion to dismiss. Doc. 14. Plaintiff's motion to strike was granted by order dated November 5, 2013. Doc.19. Plaintiff filed an Amended Complaint on November 18, 2013. Doc. 21. Defendants filed an Amended Answer and Counterclaim against Plaintiff on January 3, 2014. Doc. 26.

On June 24, 2014, Plaintiff moved for class certification. By order dated January 22, 2015, the Court granted Plaintiff's class certification motion. Doc. 61. The Court certified both classes under Rule 23(b)(1) and 23(b)(3) for Counts I, II and III and also certified Class 1 for Count I claims under Rule 23(b)(2).

**Discovery Completed.** The Parties reached agreement in this case on June 22, 2015 shortly before all discovery was scheduled to close on July 10, 2015. Doc. 75. The discovery in this case was extensive and included production and analysis of over 70,000 thousand pages of documents and electronic discovery including hundreds of spreadsheets regarding class members and contributions (both Reciprocal and Arizona contributions) from June 1, 2002 through the end of the 2013 Plan Year. Martin Decl. ¶11. Plaintiff

---

[4] The Amended Complaint also asserts individual claims for violations of ERISA's claims procedures and disclosure requirements, seeking declaratory and injunctive relief and statutory penalties (Count IV). Plaintiff agreed to forego his individual claims to achieve the Settlement Agreement on behalf of Class Members. Martin Decl. ¶26.

served numerous discovery requests and several third party subpoenas. *Id.* The Parties engaged in several informal exchanges of discovery and conferred on several occasions to resolve various discovery disputes. *Id.* Defendants served discovery requests on Plaintiff and Plaintiff responded to those requests. Defendants deposed Plaintiff in Denver, Colorado. Plaintiff conducted the Rule 30(b)(6) deposition of Defendants and the depositions of Defendants' third party administrator in Denver, Colorado and the deposition of a key trustee in Phoenix. *Id.* ¶12. At the time of settlement, eight more depositions were scheduled during the remaining discovery period. Significant preparation for those depositions and for dispositive motions, which were due shortly thereafter, had begun. *Id.*

During the litigation, Plaintiff served two expert witness reports authored by Plaintiff's expert forensic accountant. *Id.* ¶13. Class Counsel also consulted with the pension actuary with respect to Defendants' actuarial valuations and financial reports. *Id.* Plaintiff's expert forensic accountant spent hundreds of hours in this litigation working with Class Counsel to analyze information and documents provided by Defendants for purposes of calculating losses and working with Class Counsel to prepare reports and to develop the plan of allocation for purposes of settlement. *Id.*

**Mediation and Settlement Efforts.** The Parties met several times, both before and after the case was filed, to try to resolve the issues. Doc. 71. In May 2015 the Parties engaged Ronald Dean, an attorney and mediator with considerable expertise in complex ERISA class action litigation. Martin Decl. ¶14, 15. The Parties participated in an all-day mediation on May 27, 2015, but failed to resolve the matter. *Id.* Following mediation, the Parties had a discovery dispute about the expert depositions, Plaintiff served an expert rebuttal report, and discovery responses and depositions were taken in the early part of June 2015. *Id.* ¶14. The mediator continued to have several discussions with counsel for the Parties. *Id*. The Parties met again in person and were finally able to reach the Agreement on June 22, 2015. *Id.*

**I.   THE SETTLEMENT AGREEMENT PROVIDES SUBSTANTIAL BENEFITS TO THE CLASS MEMBERS**

The Settlement Agreement is a fair, reasonable and adequate result for the Class

Members. The principal terms of the Settlement Agreement are summarized in the Joint Motion for Preliminary Approval, at pp. 5-7, incorporated herein by reference. During the settlement process, Class Counsel worked extensively with their expert to analyze Defendants' documents and spreadsheets and Class Member damages and potential recoveries using the same damages models and theories that were used in the litigation. Martin Decl. ¶¶14-15; Miessner Decl. ¶¶17-19. Class Counsel and their expert continued their analysis to develop the Plan of Allocation to ensure that the Settlement Agreement is fair and equitable and in the best interests of all Class Members. *Id.*

The Settlement Agreement resolves the claims in this litigation by providing $5.8 million in DC Plan benefits and non-monetary relief to the 859 Class Members.[5] As explained in detail above, the anticipated Settlement Benefits provide a substantial percentage of recovery to Class Members who suffered losses – with the explicit provision in the Agreement that such payments will not reduce any Class Members' DC Plan accounts or their DB Plan benefits. The non-monetary relief will benefit all DC Plan participants in the future. There are 814 Class 1 Members, 763 of whom had losses as calculated by Plaintiff's expert under Class 1's claims.[6] *Id.* ¶18. All 280 Class 2 Members (235 of whom are also Class 1 Members), suffered monetary losses as a result of the 2009 Mid-Year Valuation Claim and will recover Settlement Benefits. *Id.*

The future and non-monetary relief provided in the Settlement Agreement is real and ensures that Class Members and DC Plan participants will receive more timely transfers of their Reciprocal Contributions with DB Plan earnings in the future, better

---

[5] The Revised Plan of Allocation is slightly different for clerical and administrative reasons including, *inter alia,* consolidation of entries where a Class Member was listed twice, providing corrected names or correct Social Security numbers. Martin Decl. ¶19. All Class Members were sent Notices that informed them of the anticipated amount that they would receive although a handful of Class Members were sent two notices and the amounts when added together, listed the total anticipated amount the Class Member would receive. *Id.*

[6] Of the 51 Class 1 Members who had no monetary losses under Class 1 claims, 14 are also Class 2 Members with losses under Class 2's claims. *Id.* This means that 822 Class Members will receive Individual Settlement Benefits and 37 Class Members who suffered no losses will not receive any monetary recovery. *Id.*

disclosures about the receipt, crediting and calculation of Reciprocal Contributions and better accounting for Reciprocal Contributions. While allowing Defendants to continue to utilize the Revised Memorandum of Understanding in the future (which Defendants have claimed throughout the litigation was the only feasible method of ensuring accuracy in the crediting of Reciprocal Contributions), the relief agreed to addresses issues that were identified in the litigation that affected Class Members who received Reciprocal Contributions. In addition, and in reaction to the claims in this lawsuit, Defendants amended the DB Plan to permit DB Plan participants to earn up to a year and a half of credit under the DB Plan. This DB Plan change addresses one of the issues challenged in the lawsuit regarding the Revised Memorandum of Understanding which allowed the DB Plan to retain a pro-rata share of reciprocal contributions even after a full year of credit for participants had been obtained and no additional benefit to an individual DB Plan participant was credited. While the change made by the DB Plan to allow the crediting of additional hours worked in a year was effectuated after the lawsuit was begun and before the settlement agreement was entered into, the Settlement Agreement places restrictions on the ability of the DB Plan Trustees to amend this benefit improvement in the future.

## II.   THE SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e)

"[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1993)).  The Ninth Circuit has stated:  "it must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation...."  *Id.* (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)).

The approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlement on a case-by-case basis, in light of all the relevant circumstances." *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986); *see also In re Mego Financial Corp. Securities Lit. v. Nadler*, 213 F.3d

454, 458 (9th Cir. 2000); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (decision regarding approval of class action settlement is committed to discretion of trial court judge "because he is exposed to the litigants, and their strategies, positions and proof") (internal quotations omitted). In reviewing a proposed class settlement, courts do "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Evans*, 475 U.S. at 726-27; *Staton v. Boeing Co.*, 327 F.3d 938, 963 n.16 (9th Cir. 2003). The court reviewing a settlement should determine whether the proposed settlement taken as a whole is fundamentally fair, adequate, and reasonable. *Hanlon*, 150 F.3d at 1026.

In this circuit, there are eight non-exhaustive factors that are generally considered in determining whether a settlement agreement is fundamentally fair, adequate, and reasonable:

1. the strength of the plaintiffs' case;
2. the risk, expense, complexity, and likely duration of further litigation;
3. the risk of maintaining class action status throughout the trial;
4. the amount offered in settlement;
5. the extent of discovery completed, and the stage of the proceedings;
6. the experience and views of counsel;
7. the presence of a governmental participant; and
8. the reaction of the class members to the proposed settlement.

*See, e.g., Staton*, 327 F.3d at 959 (citing *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)); *In re Mego Financial Corp.*, 213 F.3d at 458; *Hanlon*, 150 F.3d at 1026. The identified factors should not be viewed as more significant than other factors, and not all factors will apply to every class action settlement. *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993); *Officers for Justice*, 688 F.2d at 625. The Ninth Circuit has further noted that because of the danger that class action settlements could compromise the interests of class members due to the individual interests and incentives of class representatives and class counsel, the district court must also consider whether there was fraud, overreaching, or collusion in reaching the settlement. *Staton*, 327 F.3d at 960.

Examined under these criteria, the Settlement Agreement is fair, reasonable, and

adequate, and an excellent result for the Class Members.

**A.     The Strength of Plaintiff's Case and the Significant Risk, Expense, Complexity and Likely Duration of Further Litigation  Favor Final Approval**

This case was legally and factually difficult. Defendants vigorously opposed class certification, including because of conflicts among Class Members. Notwithstanding Named Plaintiff's success on class certification, at the time the Settlement Agreement was reached it was clear that the upcoming dispositive motion briefing was going to be difficult. Defendants had a several defenses and affirmative defenses. The Parties and their experts had significant differences regarding the appropriate measures of relief and methodology for calculating damages.

The claims here are complex. Pension benefit claims under ERISA generally involve significant risks in a complex, demanding and evolving area of the law. Litigating this case required the devotion of significant time and resources. There was a single Plaintiff of very modest means who was being threatened with claims by Defendants that he had been overpaid by the DC Plan. The case required a large amount of attorney time and expert analysis as it was extremely document intensive. Between December 2013, when the document discovery actually began in earnest, until June 2015, when settlement was reached on the verge of dispositive motion briefing, Plaintiff obtained more than 70,000 pages of documents and hundreds of electronic spreadsheets. Records in this case were difficult to obtain and analyze. *See, e.g.,* Miessner Decl. ¶¶5,9; Bryant Decl. ¶¶6,13.

The case involved interpretation of amendments that were retroactively effective in 2002, over a decade before suit was brought. Defendants also argued that the changes were made by the collective bargaining parties and not by fiduciaries and did not implicate ERISA responsibilities. Defendants also argued that the Plan changes were the result of administrative impossibility of compliance with the original allocation Reciprocal Contribution allocation formula. While it was difficult to ascertain whether recordkeeping issues were due to difficulties with the prior third party administrator or to the methodology itself, there did appear to be some difficulties with administering the Memorandum of Understanding that improved with the implementation of the Revised Memorandum of Understanding. In addition, Defendants asserted that Plaintiff's and Class Members' claims were untimely and that Plaintiff failed to exhaust administrative remedies.

Some claims also implicated the standard of review in ERISA benefits claims. Although Plaintiff vigorously disagreed that deference should apply, the risk that the Court would apply a deferential review also made the case risky. *See* Donald T. Bogan, *ERISA: Re-thinking Firestone in Light of Great-west--implications for Standard of Review and the Right to a Jury Trial in Welfare Benefit Claims*, 37 J. Marshall L. Rev 629, 630 (Spring 2004) ("the level of review a court applies, whether *de novo* or deferential, often determines the outcome of a benefits dispute.").

Defendants also argued that Plaintiff's requested remedies were inappropriate. As explained in the Miessner Decl. ¶¶10, 13, 14, the issue of what measure of interest or lost earnings on damages should be utilized and how it should be calculated represented large differences in the amount of potential damages. Defendants also argued that any potential remedies to individual class members should be offset or eliminated entirely because they did better under the Revised Memorandum of Understanding or obtained incrementally better DB Plan benefits that they would not have received otherwise. *Id.*

Given the complexity of the issues remaining, the risks to the Settlement Class and the further delay of this case that would be entailed in completing motion practice and a potential trial, Plaintiff and Class Counsel have determined that the Settlement Agreement is fair, reasonable and in the best interests of the Settlement Class. *Taylor v. West Marine Products, Inc.*, No. C 13-04916 WHA, 2015 WL 2452788, *2-4 (N.D. Cal. May 21, 2015) (granting final approval of class action settlement based, in part, on significant additional fees and costs that would be incurred if the case were to proceed through trial and the appellate process). Defendants are represented by experienced and competent counsel. They are well-funded and have insurance defense coverage. They raised numerous defenses and affirmative defenses.

The Settlement Agreement assures that Class Members who suffered losses will recover a significant portion of those losses from this litigation. The Settlement Agreement significantly minimizes the delay and costs entailed in litigation of these issues and advances a monetary recovery to Class Members, many of whom are already retired, perhaps by many years. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 n.1 (7th Cir. 2011) (citing Richard A. Posner, *Aging and Old Age* 70–72 (1995)). The risks, delay and expense that will be avoided by the Settlement Agreement are significant. If the

Settlement Agreement is not approved, a substantial and significant amount of additional work will need to be done, including the completion of numerous depositions, dispositive motions and a potential trial involving the expert witnesses. Class Counsel expects that they would incur significantly more than the costs already expended (including expert witness fees associated with taking expert depositions). There is no assurance that Plaintiff would prevail on behalf of the Class Members for claims for a specific amount of damages or lost earnings at trial.  Even if Plaintiff wins the underlying claims on liability, if the Court rules there are triable issues of fact as to the amount of damages or measure of interest, a trial could involve a "battle of the experts" resulting in significant additional attorney and expert time and expense. The Settlement Agreement saves the Parties and the Court the time, cost, and effort of resolving these claims in Court and provides relief for all Class Members with losses. *See Nat'l Rural Telecom. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 526 (C.D.Cal. 2004) (unless settlement is clearly inadequate, approval is preferable to lengthy, expensive litigation with uncertain results).

**B.     The Risk of Maintaining Class Action Status Favors Final Approval**

Defendants forcefully argued that there were conflicts among Class Members. Although Plaintiff calculates it is only a small handful, the fact that some Class Members may have received more in their DC Plan accounts or received better DB Plan benefits under the Revised Memorandum of Understanding than under the Memorandum of Understanding raised a potential concern with respect to class action status. The Court's Order recognized these potential conflicts. Doc. 61, at p. 12. The Court granted certification, but expressly cautioned that Defendants could move for decertification. *Id.*

The Settlement Agreement resolves the litigation without any conflicts because it provides no detriment or reduction to any Class Members' DC Plan or DB Plan benefits as the result of any calculation or recalculation under the Settlement. Because "the risk remain[s] that the…class might be decertified[,]" this factor weighs in favor of settlement. *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *see also In re Toys R Us-Delaware, Inc.—Fair and Accurate Credit Transactions Act (FACTA) Litigation*, 295 F.R.D. 438, 452-53 (C.D. Cal. 2014); *McKenzie v. Federal Exp. Corp.*, No. CV 10–02420 GAF (PLAX), 2012 WL 2930201, *4 (C.D. Cal. July 2, 2012).

**C.     The Amount Offered in Settlement is Substantial and Favors Final Approval**

The Ninth Circuit has previously noted that "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. [A] proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved[.]" *Officers for Justice*, 688 F.2d at 625 (emphasis supplied). Estimates of a fair settlement figure are to be tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery. *In re Toys R Us-Delaware, Inc.*, 295 F.R.D. at 453.

In the present matter, the amount offered in the Settlement is $5.8 million for the 859 Class Members, plus significant additional prospective relief. The $5.8 million Settlement Fund represents a reasonable and fair settlement amount that provides for approximately 89.3% of the amount Class Counsel's expert calculated as the total value of the Class Members' damages using a highly favorable measure of losses utilizing Amendment 1 Methodology for Class 1 that disregarded the DB Plan's negative earnings. If the motion for attorneys' fees and the case contribution award is granted, Class Members will receive a net payment of approximately 66.6% of their losses computed in this manner. Under the methodology for calculating losses argued for by the Defendants utilizing the actual earnings for the DB Plan in all years including years in which the DB Plan had negative earnings, the $5.8 million Settlement Fund would represent over 105% of this amount with a net payment to Class Members of approximately 78.4% of losses.

Considering the uncertainties of trial, class certification, dispositive motions, the expected duration of litigation and potential challenges relating to damage calculations, the amount offered in the Settlement Agreement is highly favorable. *See, e.g., In re Mego Financial Corp.*, 213 F.3d at 459 (approving a settlement that was 42% of estimated damages and stated that even using the objectors' damages estimates, a settlement of 14% would be fair); *Williams*, 658 F.3d at 634 (upholding approval of settlement for retirees who received approximately 24.3% and 35.5% of value of claims).

14

**D.    Counsel has Performed Sufficient Discovery, and the Proceedings are Sufficiently Advanced, to Allow An Informed Settlement Decision**

In the class action context, while "formal discovery is not a necessary ticket to the bargaining table[,]" the fact that the Settlement Agreement was reached after substantial discovery also supports approval. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (internal citation and quotation omitted). During the litigation, as set forth above and in the Martin Decl. ¶¶10-15, Class Counsel conducted an extensive investigation and discovery, including the completion of broad-based discovery that resulted in the production of over 70,000 pages of documents and electronic discovery, two expert reports and depositions of Defendants' Rule 30(b)(6) representative, third party administrator and a key trustee. Class Counsel worked with two experts. The extent of the completed discovery favors a finding that the Settlement is fair, reasonable, and adequate. *In re Toys R Us-Delaware, Inc.*, 295 F.R.D. at 454; *Lee v. Enterprise Leasing Co.-West*, No. 3:10-CV-00326-LRH-WGC, 2015 WL 2345540, at *6 (D. Nev. May 15, 2015) (after substantial discovery, little ambiguity remained as to each class member's potential recovery).

**E.    The Settlement Was Negotiated by Highly Experienced Class Counsel, Who View it as Fair, Reasonable and Adequate**

The recommendations of Class Counsel "should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted). Additionally, courts may attach a presumption of fairness and adequacy to a class settlement reached in an arm's-length negotiation among experienced, capable counsel, after meaningful discovery. *Wakefield v. Wells Fargo & Company*, Case No. 3:13-cv-05053 LB, 2015 WL 3430240, *4 (N.D. Cal. May 28, 2015); *see also* Manual for Complex Litigation (3d ed.) § 30.42 (1995). Class Counsel consists of very experienced class action, ERISA litigators who have the necessary skill and experience to litigate an ERISA class action case and are very well-equipped to negotiate a fair settlement for the Class Members. Martin Decl. ¶¶10-15. Class Counsel's opinion deserves great weight both because of their familiarity with the litigation and because of their extensive

experience in similar actions. *See In re Washington Pub. Power Supply Sys. Sec. Lit.*, 720 F. Supp. 1379, 1392 (D. Ariz. 1989).

Class Counsel has carefully analyzed the issues and evidence, the risks to the Class Members in continuing the litigation, the total potential damages and the benefits and detriments of the Settlement Agreement reached with Defendants. Based on an exhaustive review of the relevant factors in this case, Class Counsel is satisfied that the Settlement Agreement is fair, reasonable, adequate and in the best interests of the Class Members.

**F.    The Settlement Was Reached After Extensive and Adversarial Negotiations**

The Settlement Agreement is truly the product of legitimate arm's-length negotiations. Although the Parties attempted to reach a settlement many times throughout the litigation, their efforts were not successful. Doc. 71, Martin Decl. ¶14. The Settlement Agreement was reached with a neutral, experienced ERISA class action mediator. During mediation efforts, both Class Counsel and Defendants represented the interests of their respective clients zealously and continued to litigate vigorously when mediation efforts were unsuccessful at first. *Id.* There are absolutely no signs of collusion. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). For example, there is no "clear sailing" arrangement between the Parties and no Settlement Funds may revert back to Defendants. *Id.*

**G.    The Reaction of the Settlement Class Supports Final Approval.**

While the time for objections has not yet passed, so far not a single Class Member has objected to the Settlement and the reaction to the proposed Agreement has been favorable. *See Relente v. Viator, Inc.*, Case No. 12-cv-05868-JD, 2015 WL 2089178, *2 (N.D. Cal. May 4, 2015) (granting final approval after considering, *inter alia*, that no class members had objected to settlement); *see also Nat'l Rural Telecom. Coop.*, 221 F.R.D. at 529 (noting absence of objections as "compelling evidence" that settlement is "fair, just, reasonable, and adequate").

As a whole, the evidence indicates Class Members support the Settlement

Agreement.[7] On August 7, 2015, this Court approved, as to form and content, the Notice attached to the Settlement Agreement. Doc. 103. On August 12, 2015, the class action administrator mailed the Notice and launched a toll free phone number and a website, both of which are identified in the Notice, providing additional information. The class action administrator will file a detailed declaration regarding notice procedures prior to the final fairness hearing. Class Counsel's phone number, address and email address are listed in the Notice. The mailed Notices contain a description of the Settlement, the Class Members' anticipated amount of Individual Settlement Benefits set forth on the Plan of Allocation, the requested attorneys' fees and cases contribution award. The Notices also contain Class Counsel's contact information. To date, the reaction from Class Members with whom Class Counsel has spoken has been favorable. Martin Decl. ¶17.  To date no Class Member has objected or indicated that he or she is displeased by the Settlement. *Id.*

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Settlement be approved and that the Court give final approval to the agreement and enter the Final Judgment following the Fairness Hearing as set forth in Section XIV(B).

Respectfully submitted this 21st day of October 2015.

**MARTIN & BONNETT, P.L.L.C.**

By:  s/Susan Martin
Susan Martin
Jennifer L. Kroll
1850 N. Central Ave. Suite 2010
Phoenix, AZ 85004
(602) 240-6900

Attorneys for Plaintiff and Class Members

---

[7]  Even settlements with significant numbers of objectors (which is not the case here) have been upheld as fair and adequate.  *See*, *e.g.*, *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988) (settlement approved despite objections from 45% of class members).

**CERTIFICATE OF SERVICE**

1

2          I hereby certify that on October 21, 2015 I electronically transmitted the attached

3    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

     Notice of Electronic Filing to the following CM/ECF registrants:

4

5    Michael Keenan
     Ward, Keenan & Barrett, PC

6    3838 N. Central Avenue, Suite 1720
     Phoenix, AZ 85012

7

8    Keith Overholt
     Jeffrey D. Gardner

9    Jennings, Strouss & Salmon, P.L.C.
     One East Washington Street, Suite 1900

10   Phoenix, AZ 85004-2554

11
     Attorneys for Defendants

12

13   s/J. Kroll

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28